IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

| | | |
|---|---|---|
| MELINDA STARKS BRANT, | ) | |
| | ) | |
| Claimant, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 4:12-CV-1086-KOB |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

The claimant, Melinda Starks Brant, brings this action pursuant to the provisions of 42 U.S.C. § 405(g), seeking judicial review of a final adverse decision of the Commissioner of the Social Security Administration denying her application for disability insurance benefits.  Brant timely pursued and exhausted her administrative remedies available before the Commissioner.  Accordingly, this case is now ripe for judicial review under 42 U.S.C. § 405(g).  Based on the court's review of the record and the briefs submitted by the parties, the court finds that the decision of the Commissioner is due to be reversed and remanded for further proceedings.

## I. STANDARD OF REVIEW

The sole function of this court is to determine whether the decision of the Commissioner is supported by substantial evidence and whether the ALJ applied proper legal standards.  *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).  To that

end this court "must scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence." *Id.* (citations omitted). Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* This court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. *Id.* Even if the court finds that the evidence preponderates against the Commissioner's decision, the court must affirm if the decision is supported by substantial evidence. *Id.*

Unlike the deferential review standard applied to the Commissioner's factual findings, "no similar presumption of validity attaches to the [Commissioner's] conclusions of law, including determination of the proper standards to be applied in reviewing claims." *Wiggins v. Schweiker*, 679 F.2d 1387, 1389 (11th Cir. 1982) (quoting *Smith v. Schweiker*, 646 F.2d. 1075, 1076 (5th Cir. Unit A Jun.1981)). Therefore, this court reviews de novo the Commissioner's conclusions of law. *Ingram v. Comm'r of Soc. Sec.*, 496 F.3d 1253, 1260 (11th Cir. 2007). The Commissioner's "failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal." *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## II. STATUTORY AND REGULATORY FRAMEWORK

To qualify for disability benefits, a claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than twelve months . . . ."  42 U.S.C.

§§ 423(d)(1)(A), 1382c(a)(3)(A).  A "physical or mental impairment" is defined as "an

impairment that results from anatomical, physiological, or psychological abnormalities

which are demonstrable by medically acceptable clinical and laboratory diagnostic

techniques."  42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

Social Security regulations outline a five-step process that the Commissioner uses

to determine whether a claimant is disabled.  20 C.F.R. §§ 404.1520(a)(4)(i)-(v),

416.920(a)(4)(i)-(v).  The Commissioner must determine in sequence:

(1)     whether the claimant is currently engaged in substantial gainful
        activity;

(2)     whether the claimant has a severe impairment or combination of
        impairments;

(3)     whether the claimant's impairment meets or equals the severity of an
        impairment in the Listing of Impairments;[1]

(4)     whether the claimant can perform any of his or her past work; and

(5)     whether there are significant numbers of jobs in the national
        economy that the claimant can perform.

*Winschel v. Comm'r of Soc. Sec*, 631 F.3d 1176, 1178 (11th Cir. 2011).  The evaluation

process continues until the Commissioner can determine whether the claimant is disabled.

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  A claimant who is doing substantial gainful

---

[1]   The Listing of Impairments, ("Listings") found at 20 C.F.R. Part 404, Subpart P, Appendix 1, are used to make determinations of disability based upon the presence of impairments that are considered severe enough to prevent a person from doing any gainful activity.  20 C.F.R. § 404.1525.

activity will be found not disabled at step one.  20 C.F.R. §§ 404.1520 (a)(i),

416.920(a)(4)(i).  A claimant who does not have a severe impairment will be found not

disabled at step two.  20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  A claimant with

an impairment that meets or equals one in the Listing of Impairments will be found

disabled at step three.  20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

Prior to considering steps four and five, the Commissioner must assess the

claimant's residual functional capacity (RFC), which will be used to determine the

claimant's ability to work.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  A claimant who

can perform past relevant work will be found not disabled at step four.  20 C.F.R.

§§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  At step five the burden shifts to the

Commissioner to show other work the claimant can do.  *Foot v. Chater*, 67 F.3d 1553,

1559 (11th Cir. 1995).  To satisfy this burden the Commissioner must produce evidence

of work in the national economy that the claimant can do based on the claimant's RFC,

age, education, and work experience.  20 C.F.R. §§ 404.1512(f), 416.912(f).  A claimant

who can do other work will be found not disabled at step five.  20 C.F.R.

§§ 404.1520(a)(4)(v), 416.920 (a)(4)(v).  A claimant who cannot do other work will be

found disabled.  *Id.*

In the present case, the Administrative Law Judge (ALJ) determined Brant was not

engaged in substantial gainful activity, and found she had the severe impairment of

diabetes with neuropathy.  R. 15.  He concluded Brant did not suffer from a listed

impairment.  R. 17.  The ALJ found Brant had the residual functional capacity (RFC) to

4

perform sedentary work, with exceptions that included the allowance of a sit stand option, only occasional use of bilateral lower extremities, no operation of foot controls, and mild to moderate pain.  R. 18-19.  With this RFC, the ALJ found Brant was able to perform her past relevant work as a title clerk, accounting assistant, staffing coordinator, and front office clerk.  R. 20.  Therefore, he found she was not disabled at step four of the sequential evaluation framework.  R. 21.

### III. FACTUAL BACKGROUND

Brant filed an application for a period of disability and disability insurance benefits on November 5, 2008, and alleges she became disabled on November 20, 2008. R. 13.  She was 56 years old at the time of the ALJ's decision.  R. 104, 21.  She testified she cannot work because of neuropathic pain in her feet and legs caused by diabetes mellitus.  R. 34-35.  She also testified that she has pain and numbness in her hands.  R. 36-37.  Brant testified that on most days her pain reached the level of an eight or nine, on a scale of one to ten.  R. 36-37.  She testified that she uses a cane when she walks, and falls two to three times per week.  R. 39-40.  She testified that her medications made her sleepy, and caused nausea and dizziness.  R. 40.  The vocational expert testified that if Brant experienced pain consistent with her testimony, she would not be able to perform her past relevant work, or any other work.  R. 47-48.

The medical records show Brant has a long history of diabetic neuropathy.  When Brant saw Dr. Ammons, on December 16, 2005, for follow-up of her neuropathy, she noted Brant was "[d]oing much better with lyrica," and that she had been able to decrease

5

her pain medications.  R. 216.  Brant also reported that her neuropathy was better when she was seen by Dr. Ammons on March 13, 2006.  R. 212.  However, on September 5, 2006, she told Dr. Ammons that her neuropathy was worse, and she was prescribed Cymbalta.  R. 209.  At her visit to Dr. Ammons on October 30, 2006, Brant reported that her pain was not as severe, and that she had discontinued Lyrica because she was having memory problems.  R. 208.  On June 27, 2007, Dr. Ammons noted Brant was doing okay overall.  R. 207.  However, neurological examination showed decreased sensation bilaterally in the lower extremities.  R. 207.  On October 1, 2007, Dr. Ammons noted Brant was having more pain in her hands and feet.  R. 206.  On February 12, 2008, Brant reported pain in her legs and feet, and that she was stumbling more.  R. 205.  On examination Dr. Ammons noted decreased sensation in Brant's lower extremities.  R. 205.

Records nearer to Brant's alleged onset date show she had arthroscopic surgery on her right knee in September 2008.  R. 196.  An October 13, 2008, treatment note from Dr. Ammons shows that her knee recovered well following surgery.  However, at that time her neuropathy was worse, and now involved her hands.  She reported that she was dropping things, unable to feel with her feet, and stumbled often.  Dr. Ammons' neurological examination showed decreased sensation in her hands and feet.  R. 193.

On February 18, 2009, Dr. Ammons noted Brant reported feeling tired, problems with sleep, and that her neuropathy was getting worse.  Examination revealed

6

"[d]ecreased response to stimulation by vibration on the leg/foot." Dr. Ammons noted that sensation was absent to the knee in both legs. R. 286.

The Social Security Administration sent Brant to Dr. VanMarter for a consultative examination on February 20, 2009. Dr. VanMarter noted Brant reported "tingling in her feet and difficulty in determining the position of her feet." He observed that "[s]he has no apparent motor symptoms but they are all sensory." He also noted that Brant "states her hands are somewhat less coordinated and she tends to drop things." Brant reported to Dr. VanMarter that her husband "helps with the housework and does the heavier type of cleaning such as vacuuming and mopping," and that "[s]he does most of the other things." R. 238.

On physical examination, Dr. VanMarter observed that Brant "moved around the examining room quite well," and that "[s]he was not ataxic and seemed well coordinated." Brant also "was able to walk on her toes and heels and was able to do tandem walking." Dr. VanMarter examined Brant's extremities and found her grip, forearm, and shoulder strength were normal. Flexion and extension were also normal in her hips, knees, and feet. Dr. VanMarter noted that Brant "was able to fold her thumb to all fingers and to oppose with good strength." He noted "[s]he had normal manipulative ability twirling a tongue blade in both hands quite readily and she did alternating and coordinating movements quite well." He found she had "decreased sensation to pinprick and vibration in the upper extremities from the elbows distally and [in] the lower

extremities from the knees distally." R. 239.  Dr. VanMarter's concluding comment was as follows:

> Although this applicant is stated to have a peripheral polyneuropathy, the sensory changes are a glove and stocking type of sensory distribution, which is more likely to be of a functional nature.  Interestingly, the history states that the nerve conduction studies and EMG studies were normal in 2003.  Here is the examiner's opinion that she could continue as she has in the past with some type of an office position.  She could continue in an occupation which would be in an office setting.

R. 240.

Brant saw Dr. Ammons on May 4, 2009, and reported the pain in her feet was worse, and that it was starting in her arms.  She also reported she was "having weakness; dropping things; falling; [and] using crutches more."  She complained that her "joints ache all the time," and that "some days are very bad."  She reported that her husband had started taking over some household duties, and that she had "noticed tremors now especially when trying to eat."  On examination, Dr. Ammons found a "[d]ecreased response to stimulation by vibration on the leg/foot," with "sensation absent up to the knee bilaterally."  R. 282.

Dr. Ammons also completed a physical capacity evaluation on May 4, 2009, which indicated Brant could sit, stand and walk for zero hours at one time.  She also limited Brant to performing these activities zero hours in an eight-hour day.  R. 252.  Dr. Ammons noted Brant has "idiopathic peripheral neuropathy with continuous pain;[and] requires frequent shifts in position for even minimal comfort.  Due to neuropathy she

falls frequently." R. 253. Dr. Ammons indicated Brant's medications cause sedation, nausea, and dizziness. R. 254.

When she saw Dr. Ammons on October 20, 2009, Brant reported she was getting weaker, falling every other day, and had noticed a tremor in both hands for a few months. The neurological examination showed a "[d]ecreased response to stimulation by vibration on the leg/foot," that was up to knee level. R. 274.

Dr. Ammons referred Brant to Dr. Shin J. Oh for a neurology evaluation on January 29, 2010. The examination showed that Brant's motor function was normal throughout. Sensory function examination showed a decreased pinprick to just below the knee bilaterally, and into the mid-forearm in the upper extremities. There was decreased sensitivity to vibration up to the knees. Proprioception was intact. Dr. Oh found Brant's gait was "[s]low but normal [and] non-stressed," and her "tip toe and heel walking [was] slightly abnormal." Brant had "poor tandem gait." R. 260. Dr. Oh's assessment was that Brant had "progressively worsening lower extremity paresthesias likely secondary to diabetic peripheral neuropathy." R. 261.

When Brant saw Dr. Ammons on March 17, 2010, she reported that her pain was worse, constant, and in all joints. Physical examination showed a decreased response to stimulation by vibration bilaterally up to the knees, with absent sensation in the hand to the wrists. R. 271.

On May 18, 2010, Dr. Ammons noted Brant reported a migraine headache that started two weeks previously. Her neuropathy was still present, and she reported she was

still depressed, and tired of hurting.  The neurological examination showed a decreased response to stimulation by vibration in the leg/foot.  Dr. Ammons reported Brant's gait and station were normal.  She found Brant's deep tendon reflexes were +2 and symmetrical bilaterally.  She also noted that there were "[n]o sensory or motor deficits." R. 293.

When Brant saw Dr. Ammons on June 8, 2010, she reported she was "[o]verall the same."  The neurological examination showed decreased response to stimulation by vibration on the leg/foot.  Her gait and station were normal.  Dr. Ammons found Brant's deep tendon reflexes were +2 and symmetrical bilaterally.  She also noted that there were "[n]o sensory or motor deficits."  R. 291.

## IV. ISSUES PRESENTED

Brant raises the following issues on appeal: 1) whether the ALJ committed an error of law by failing to properly apply Listing 9.08A to the facts of the case; and 2) whether the ALJ erred in not finding her disabled because of pain.

## V. DISCUSSION

### A.

Brant argues the ALJ erred in not finding her disabled under Listing 9.08A.[2]  Pl.'s Br. 5.  To meet Listing 9.08A, a claimant must have diabetes mellitus with "[n]europathy

---

[2]  Listing 9.09A was deleted from the Commissioner's Listing of Impairments, effective June 7, 2011, but was in effect at the time the ALJ issued his decision on September 23, 2010. *See Revised Medical Criteria for Evaluating Endocrine Disorders*, 76 Fed. Reg. 19692, (Apr. 8, 2011).

demonstrated by significant and persistent disorganization of motor function in two

extremities resulting in sustained disturbance of gross and dexterous movements, or gait

and station (see 11.00C)."  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 9.08A (2010) (hereinafter

"Listing 9.08A").  In turn, section 11.00C provides as follows:

> C. *Persistent disorganization of motor function* in the form of paresis or
> paralysis, tremor or other involuntary movements, ataxia and sensory
> disturbances (any or all of which may be due to cerebral cerebellar, brain
> stem, spinal cord, or peripheral nerve dysfunction) which occur singly or in
> various combination, frequently provides the sole or partial basis for
> decision in cases of neurological impairment.  The assessment of
> impairment depends on the degree of interference with locomotion and/or
> interference with the use of fingers, hands, and arms.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 11.00C (2010) (hereinafter "Listing 11.00C").

In finding Brant did not meet Listing 9.08A, the ALJ recited the requirements of

Listing 9.08A, and concluded that "[t]he evidence does not establish that the claimant's

impairments meet" Listing 9.08A.  R. 17.  He did not discuss the evidence or explain the

reasoning behind his decision.  However, the ALJ was "not required [to] mechanically

recite the evidence leading to [his] determination" that Brant did not meet Listing 9.08A.

*Hutchison v. Bowen*, 787 F.2d 1461, 1463 (11th Cir. 1986) (holding that an ALJ may

make an implied finding that a listing is not met, and that the ALJ is not required to

mechanically recite the evidence leading to that determination).  Therefore, this court

must examine the record to determine whether substantial evidence supports the ALJ's

finding that Brant did not meet Listing 9.08A.  *See Edwards v. Heckler,* 736 F.2d 625,

11

629 (11th Cir. 1984) (examining the ALJ's implied finding that the claimant did not meet a listing under the substantial evidence test).

In the present case, no one disputes that Brant has neuropathy caused by diabetes mellitus. She argues that she meets Listing 9.08A because her neuropathy causes "a significant compromise of the lower extremities which consist of significant and persistent disorganization of motor function of the two lower extremities resulting in sustained disturbance of [Brant's] gait and station." Pl.'s Br. 14.

The burden is on Brant to show that her impairment meets a listed impairment. *Barron v. Sullivan*, 924 F.2d 227, 229 (11th Cir. 1991). The regulations also provide that a claimant "must furnish medical and other evidence that we can use to reach conclusions about your medical impairment(s) . . . ." 20 C.F.R. § 404.1512(a). To meet Listing 9.08A, Brant's impairment must "meet a*ll* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)(emphasis in original).

To meet Listing 9.08A, Brant must first show that her neuropathy causes "significant and persistent disorganization of motor function in two extremities." Although much evidence shows Brant has sensory deficits in her arms and legs, the medical records do not show that she has "significant and persistent disorganization" of motor function. Dr. VanMarter's report states that Brant "has no apparent motor symptoms." R. 238. Dr. Oh also found that Brant's motor function was normal throughout. R. 260. Brant's primary care physician, Dr. Ammons, reported sensory

abnormalities on a number of occasions.  However, Dr. Ammons never reported any abnormalities in motor functioning.

Even if Brant had shown the requisite disorganization of motor functions, she has not shown that it causes a "sustained disturbance" in either her gross and dexterous movements, or her gait and station.  The disturbance in these areas must be assessed under Listing 11.00C based "on the degree of interference with locomotion and/or interference with the use of fingers, hands, and arms."

The record contains no evidence showing that she has a disturbance in her gross movements caused by a disorganization of motor function.  As for her dexterous movements, Dr. VanMarter observed that Brant "had normal manipulative ability twirling a tongue blade in both hands quite readily and she did alternating and coordinating movements quite well."  R. 239.

Although Brant argues that she has disorganization of motor function of the two lower extremities that results in sustained disturbance of her gait and station, Dr. VanMarter observed that she "moved around the examining room quite well," and that "[s]he was not ataxic and seemed well coordinated."  R. 239.  He found she was also "able to walk on her toes and heels and was able to do tandem walking."  R. 239.  In his neurological evaluation of Brant, Dr. Oh found her gait was "[s]low but normal [and] non-stressed," and her "tip toe and heel walking [was] slightly abnormal."  R. 260.  In her treatment notes, Dr. Ammons reported Brant's gait and station were normal on May 18, and June 8, 2010.  R. 293, 291.

13

In short, no evidence shows that Brant has a disorganization of motor function in two extremities that results in sustained disturbance of both gross and dexterous movement.  Substantial evidence shows Brant has no sustained disturbance of her gait and station.  Therefore, the ALJ's finding that Brant's impairments do not meet Listing 9.08A is reasonable, and is supported by substantial evidence.

**B.**

Brant's second argument is that the ALJ erred in not finding her disabled because of pain.  She argues the ALJ did not properly apply the Eleventh Circuit pain standard in deciding her case.  Pl.'s Br. 16.

In this circuit a "pain standard" is applied "when a claimant attempts to establish disability through his or her own testimony of pain or other subjective symptoms." *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995).  The standard requires a claimant to show "evidence of an underlying medical condition and (1) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (2) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain." *Landry v. Heckler*, 782 F. 2d 1551, 1553 (11th Cir. 1986).  "[W]hether objective medical impairments could reasonably be expected to produce the pain complained of is a question of fact . . . subject to review in the courts to see if it is supported by substantial evidence." *Id.*

 "[A] claimant's subjective testimony supported by medical evidence that satisfies the standard is itself sufficient to support a finding of disability." *Holt v. Sullivan*, 921

14

F.2d 1221, 1223 (11th Cir. 1991).  "If the ALJ decides not to credit such testimony, he must articulate explicit and adequate reasons for doing so."  *Id*.  "A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court."  *Id.*

However, an ALJ's decision that "focus[es] upon one aspect of the evidence and ignor[es] other parts of the record" is not supported by substantial evidence.  *McCruter v. Bowen*, 791 F.2d 1544, 1548 (11th Cir. 1986).  Likewise, when a court reviews the ALJ's decision, it should not affirm unless the record as a whole shows that the decision is supported by substantial evidence.  "It is not enough to discover a piece of evidence which supports that decision, but to disregard other contrary evidence.  The review must take into account and evaluate the record as a whole."  *Id*.  (citing *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 487–88 (1951)).

In the present case, the ALJ found Brant's "medically determinable impairments could reasonably be expected to cause [her] alleged symptoms."  R. 18.  Therefore, she satisfied the Eleventh Circuit pain standard.  Under that standard, the ALJ was required to consider her subjective testimony, and to articulate explicit and adequate reasons if he chose not to credit it.  The ALJ articulated a number of reasons why he found Brant's allegations were not fully credible, which this court must review in light of the entire record to determine whether substantial evidence supports his decision.

In considering Brant's credibility, the ALJ found that "[t]he medical records are void of objective, clinical evidence to substantiate the claimant's contentions that she is as

limited as she claims." R. 19.  The ALJ also observed that even though Brant reported to Dr. Ammons that she had tremors when she was trying to eat, Dr. Ammons' "examinations records do not note that tremors were present." R. 19.

The regulations provide that the ALJ will consider objective medical evidence in assessing a claimant's symptoms.  20 C.F.R. § 404.1529(c)(2).  However, an ALJ cannot reject a claimant's allegations of disabling pain or other symptoms solely because of the absence of objective medical evidence substantiating those allegations.  20 C.F.R. § 404.1529(c)(2) ("[W]e will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements.").  Therefore, the absence of objective medical evidence substantiating Brant's allegations alone is insufficient to support the ALJ's rejection of her testimony.

The ALJ also stated that Brant's use of medications "do[es] not support a finding of disability." R. 19.  One of the relevant factors in assessing Brant's credibility is "[t]he type, dosage, effectiveness, and side effects of any medication" she uses or has used to alleviate her pain.  20 C.F.R. § 404.1529(3)(iv).  In the present case, the medical records show Brant took narcotic pain medication on a continuous basis during the relevant time period.  During the course of her treatment, her dosage was increased on October 13, 2008, after she reported that her neuropathy was worsening.  R. 193.  Brant also took other medications, including Lyrica, which initially decreased her pain in 2005 and 2006. R. 216, 209.  However, on October 30, 2006, she reported she stopped taking Lyrica

16

because it caused memory problems.  R. 208.  Dr. Ammons asked Brant to try a lower

dose of Lyrica on October 1, 2007.  R. 205.  However, Dr. Ammons reported on

February 12, 2008, that Brant did not "get the Lyrica because of price."  R. 205.  When

Brant reported that her neuropathy was worsening on February 18, 2009, Dr. Ammons

restarted her on Cymbalta, which she had taken previously.  R. 286.  However, on May

18, 2010, Dr. Ammons noted Brant would be weaned off of Cymbalta because she could

not "afford $300 per month."  R. 294.

Considered as a whole, Brant's usage of medication shows that she had side

effects from Lyrica at high dosages, and could not afford it when a lower dose was

prescribed.  Although she tolerated Cymbalta, she stopped taking it because it was too

expensive.[3]  Dr. Ammons also increased Brant's narcotic pain medication dosage in

response to increased symptoms.  Therefore, the ALJ's finding that Brant's use of

medications did not support her allegations of disabling symptoms is not reasonable

based on the evidence of record.

The ALJ also discredited Brant's testimony because of perceived inconsistencies

in her statements.  He found her testimony that "she gets dizzy, sleepy, nauseous and

shaky from her medications" was inconsistent with Dr. Ammons' treatment notes.  R. 19.

Inconsistencies or conflicts between a claimant's testimony and other evidence is a factor

---

[3] Brant's failure to take the prescribed medications is excused because of her
inability to afford them. *See Dawkins v. Bowen*, 848 F.2d 1211, 1213 (11th Cir. 1988)
("We agree with every circuit that has considered the issue that poverty excuses
noncompliance.").

the ALJ must consider in evaluating symptoms. *See* 20 C.F.R. §§ 404.1529(c)(4) ("We will consider . . . the extent to which there are any conflicts between your statements and the rest of the evidence, including your history, the signs and laboratory findings . . . ."). The ALJ stated that Dr. Ammons' treatment notes show no reports of nausea, and only reports of dizziness in 2005 due to mitral valve prolapse. R. 19.  However, he failed to consider Dr. Ammons' statement that Brant had "sedation, nausea, [and] dizziness" as side effects of her medications on a form she completed on May 4, 2009. R. 254. Although the form was not a treatment note, it represents the expressed opinion of Brant's treating physician that she suffered those side effects from her medications.  Therefore, it was unreasonable for the ALJ to use the absence of reported side effects in Dr. Ammons' treatment notes to discredit Brant.

The ALJ also found that Brant's statement to Dr. VanMarter "that Lyrica in high dose has no effect," was contradicted by her reports to Dr. Ammons "that she was doing much better with Lyrica" and that her use of pain medication had decreased. R. 19.  The report to Dr. Ammons was made at her December 16, 2005, visit.  R. 216.  It has little relevance to Brant's condition on February 20, 2009, when she was examined by Dr. VanMarter.  The ALJ placed too much weight on the inconsistency between this isolated statement made by Brant, and her reports to Dr. Ammons *four years* previously.  *See McCruter*, 791 F.2d at 1548 (finding the ALJ "attached too much weight to the supposed 'exaggeration' by appellant of her pain").  This supposed inconsistency does not provide substantial evidence to support the ALJ's decision not to credit Brant's testimony.

18

Another perceived inconsistency noted by the ALJ was that when Brant saw Dr. Ammons on June 8, 2010, "she denied joint/limb pain, muscle pain or stiffness."  R. 19. The ALJ also stated that Brant "denied seizures, headache and chronic neuropathic pain."[4]  R.19.  That treatment note also states in the history of present illness (HPI) section that Brant reported that she had been "using anodyne– feet are hating it– seem to hurt worse."[5]  R. 291.  This complaint contradicts the notation of no chronic neuropathic pain in the ROS section.  R. 291.  Moreover,  Dr. Ammons' treatment notes show several visits when Brant clearly reported that she was in pain, even though the ROS section indicated that she denied pain.  For example, on May 17, 2010, the HPI section of the treatment note states: "Pain is worse; constantly; . . . having pain in all joints; worse in afternoon and into night; worse with activity."  R. 271.  However, the "Neuro" entry in the ROS section states Brant "denies seizures, headache, weakness or pain."  R. 271.  On May 18, 2010, the HPI section contains the following: "migraine started two weeks ago;

---

[4]  The June 8, 2010, treatment note states as follows: "denies seizures, headache, chronic neuropathic pain." R. 291.  An earlier treatment note of October 1, 2007, contains the following notation in the same ROS section: "denies seizures, headache, ; inc in neuropathic pain." R. 206.  The earlier entry was not meant to indicate Brant denied an increase in her neuropathic pain because on that same visit Dr. Ammons states Brant reported "[h]aving more pain," which "occurs continuously." R. 206.  It is possible, therefore, that the absence of a semicolon in the June 2010 note was a typographical error, and that the notation was actually an indication that Brant complained of "chronic neuropathic pain."

[5]  This is apparently a reference to "anodyne monochromatic infrared photo energy." *See* http://www.ncbi.nlm.nih.gov/pubmed/17977931

med helped; still having slight [headache]." R. 293. Yet the "Neuro" entry in the ROS

sections states Brant "denies seizure, headache, weakness or general pain." R. 293.

Therefore, the ROS entries in Dr. Ammons' treatment notes do not always

accurately reflect Brant's complaints of pain at those visits. The treatment records show

Brant sought treatment for neuropathic pain on a continuous basis since at least 2005, and

that on several occasions the ROS section of Dr. Ammons' treatment notes indicates the

absence of pain, when pain was clearly Brant's chief complaint documented in the

narrative statements. Therefore, the ALJ's use of the entry in the review of systems

(ROS) section of Dr. Ammons' treatment note of June 8, 2010, to discredit Brant's

testimony was not reasonable.

The ALJ also used Brant's daily activities to discredit her testimony. He found

that although Brant "described daily activities which are fairly limited," the "allegedly

limited daily activities cannot be objectively verified with any reasonable degree of

certainty." R. 19. He further found that even if Brant's "daily activities are truly as

limited as alleged, it is difficult to attribute that degree of limitation to the claimant's

medical condition, as opposed to other reasons, in view of the relatively weak medical

evidence and other factors discussed in this decision." R. 19. The ALJ concluded

Brant's reports of limited daily activities were "outweighed by the other factors discussed

in [his] decision." R. 19.

Brant's daily activities are relevant in assessing her credibility. 20 C.F.R. §

404.1529(3)(iv). However, the ALJ's characterization of the medical evidence as

20

"relatively weak" is not supported by substantial evidence.  The treatment records show

Brant was continuously treated for worsening neuropathic pain since at least 2005.

Contrary to the ALJ's assertion, the treatment notes support Brant's allegations of limited

daily activities.  On May 4, 2009, Brant reported that her "husband has started taking over

some of household duties," which is consistent with her testimony the she had to limit her

daily activities.  R. 282.  Dr. Ammons also encouraged Brant to use a cane on October 20,

2009, which also shows that her activities of daily living were limited by her condition.

R. 275.  Therefore, the ALJ did not reasonably discount Brant's reports of limited daily

activities, or to find that her daily activities did not support her allegations of disabling

symptoms.

When taken as a whole, the treatment records show a "longitudinal history of

complaints and attempts at relief" that support Brant's pain allegations.  See SSR 96-7P

1996 WL 374186 at *7 ("In general, a longitudinal medical record demonstrating an

individual's attempts to seek medical treatment for pain or other symptoms and to follow

that treatment once it is prescribed lends support to an individual's allegations of intense

or persistent pain or other symptoms for the purposes of judging the credibility of the

individual's statements.").  Rather than considering Brant's longitudinal treatment

history, the ALJ improperly focused on isolated portions of the evidence to find Brant

was not credible.  When the entire record is considered, substantial evidence does not

support the ALJ's decision not to credit Brant's testimony.  Because the ALJ's credibility

finding was not supported by substantial evidence, the case must be remanded so that the

Commissioner can properly consider Brant's pain testimony in accordance with the applicable legal standards.

## VI. CONCLUSION

For the above reasons, the court concludes the ALJ's credibility determination is not supported by substantial evidence.  Therefore, the decision of the Commissioner will be  reversed and the case remanded so that the Commissioner can make proper credibility determinations in accordance with the applicable legal standards.  An appropriate order will be entered.

DONE and ORDERED this 8th day of April, 2014.

_____
    KARON OWEN BOWDRE
    CHIEF UNITED STATES DISTRICT JUDGE

22